**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**
**AT KNOXVILLE**
**AUGUST SESSION, 1996**

FILED

April 24, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | ) | |
| | ) | No. 03C01-9502-CR-00039 |
| Appellee | ) | |
| | ) | BLOUNT COUNTY |
| vs. | ) | |
| | ) | Hon. D. Kelly Thomas, Jr., Judge |
| **CECIL SKIDMORE**, | ) | |
| | ) | (Attempted First Degree Murder) |
| Appellant | ) | |

For the Appellant:

**Mack Garner**
District Public Defender
318 Court Street
Maryville, TN 37804

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Eugene J. Honea**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**Mike Flynn**
District Attorney General
363 Court Street
Maryville, TN 37804-5906

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

**OPINION**

The appellant, Cecil D. Skidmore, was convicted by a Blount County jury of attempted first degree murder, a class A felony. The trial court sentenced the appellant as a standard, range I offender to twenty-three years imprisonment in the Tennessee Department of Correction. In this appeal, the appellant challenges the trial court's refusal to instruct the jury concerning the offense of attempted voluntary manslaughter, the sufficiency of the evidence supporting the jury's verdict, and the trial court's imposition of a sentence of twenty-three years.

Following a thorough review of the record, we affirm the judgment of the trial court.

## I. Factual Background

This case arose from a shooting on December 17, 1992, at the Nippondenso Meter Plant, located in Maryville, Tennessee. In December, 1992, the appellant was a temporary employee of the Nippondenso Plant. The appellant worked for the Logistics Department, collecting discarded packing foam from the different assembly lines. The victim, Jim Baskin, had worked in the Subassembly Department at the Nippondenso Plant for several years, delivering parts to the assembly lines.[1] The victim testified that his relationship with the appellant was solely work-related, but friendly. Indeed, the victim stated that, prior to the morning of December 17, 1992, he had never engaged in an extended conversation with the appellant, much less any altercation.[2] Employees of the plant generally described the appellant as "nice" and were

---

[1]Archie Bennett, a supervisor at the Nippondenso Plant, described the victim, Jimmy Baskin: "Top-notch. Good worker, very solid, got a good head on his shoulders. Very fair." Before working at the Nippondenso Plant, from 1963 until 1990, Baskin served in the United States Army.

[2]On cross-examination, Baskin testified that he once accompanied the appellant to look at a car that the appellant was selling. Baskin did not purchase the car, and he and the appellant parted amicably.

unaware of any ongoing conflict between the appellant and other Nippondenso employees, including the victim.

However, Tony Mowdy, a "tool and die maker" at the Nippondenso Plant, testified that, approximately two weeks before the shooting, the appellant had remarked to him in an angry tone of voice, "I'm thinking about killing me a goddam buck."[3] Mowdy stated that the appellant also "had a[n] . . . angered look on his face." Richard Marsh, another employee of the plant, testified that, a few days before the shooting, he and the appellant had been involved in an argument, during which the appellant threatened to assault Marsh, stating, "I'm tired of this shit. . . . I've took it too long. I've been taking it for two months now and . . . . I can't take it anymore." During the week prior to the shooting, the appellant mentioned to Marsh several times that other employees at the plant were harassing him. Linda Johnson, a Nippondenso employee, testified that, on the afternoon of December 16, 1992, she, the appellant, and another co-worker were leaving the plant following their shift. When Johnson told the appellant that she would see him the next day, he replied, "[Y]ou may and you may not see me . . . . [Y]ou may have someone new picking up your garbage." According to Johnson, the appellant was visibly upset.

On the morning of December 17, 1992, just before 5:00 a.m., employees began to arrive at the parking lot of the Nippondenso plant. At this time, several employees observed the appellant shoot repeatedly at the victim's truck. The appellant continued to fire his weapon as the truck fled the parking lot. Thereafter, the appellant walked back to his own truck and, "[v]ery nonchalantly and not in any hurry," placed his weapon on the seat of the truck and lit a cigarette. The appellant then apparently awaited the arrival of the police. At the

---

[3]The State argued at trial that the appellant was referring, in a derogatory manner, to the victim, Baskin, who is African-American.

3

time of his arrest, the appellant was "passive" and "quiet." Following the appellant's arrest, testing of the appellant's blood for alcohol and drugs produced negative results.

The victim, Baskin, additionally testified that he always drove an orange pick-up truck to work and parked in the same location. On the morning of the offense, he was scheduled to arrive at work at 5:00 a.m. The appellant's shift began at 7:00 a.m. As the victim backed into his parking space at approximately 4:45 a.m., he heard a "thump" on the window of his truck. Baskin looked through his window and observed the appellant. The appellant was speaking, and Baskin opened his door in order to hear the appellant. At this point, the appellant raised a weapon and shot Baskin twice in the chest. Baskin immediately got back into his truck and began to drive away. The appellant continued to fire his weapon, striking Baskin four more times.

Upon their arrival at the scene, the police searched the appellant's truck, recovering the following items: a .30 caliber rifle containing 18 rounds of ammunition, a .25 caliber semi-automatic pistol containing seven rounds of ammunition, and a "long-blade" knife. The rifle was capable of holding 31 rounds of ammunition: 30 rounds in the magazine and one round in the chamber. The pistol was capable of holding seven rounds: six in the magazine and one in the chamber. The safety mechanism had been deactivated on both weapons. The police found thirteen .30 caliber spent casings in the general vicinity of the shooting.

Dr. Melissa Trekell, the physician who treated the victim, also testified at trial. She stated that Baskin suffered six gunshot wounds in the chest. She further described Baskin's condition and treatment:

Mr. Baskin came in and he had sucking chest wounds. And when you breathe and you have holes in your chest, air travels in and

4

out. And we put chest tubes in, which are drainage tubes, to both sides of his chest when he arrived in the emergency room. His blood pressure was stabilized and subsequently dropped again, and he continued bleeding. And so we took him to surgery to do what we call an exploratory thoracotomy, where we actually open his chest, his right chest, and take a look and see what's bleeding. . . . He had a laceration in his lung, he had a tear in his lung. And also at his exit wounds here in his anterior chest, he had bleeding intercostal vessels, which are blood vessels that lie right under your ribs.

According to Dr. Trekell, Baskin almost died.

The appellant did not testify, but introduced the testimony of various family members. The appellant's brother, Richard Skidmore, testified that the appellant had always possessed a "suspicious nature" and did not respond well to teasing. Skidmore further indicated that his brother had a history of alcohol abuse, but had stopped drinking in 1987 or 1988.[4] Moreover, according to the appellant's brother, after resigning from his job at Pathway Bellows, a company in Oak Ridge, Tennessee, in 1989, and following his divorce in 1991, the appellant "began to just act bizarre." The appellant was "withdrawn and paranoid." Additionally, despite financial difficulties, the appellant began to give away valuable personal belongings. Skidmore conceded during cross-examination that, although his brother sometimes carried a rifle in his vehicle, Skidmore never believed that his brother was dangerous.

Henry Shuler, the appellant's brother-in-law, testified that, prior to his divorce in 1991, the appellant was a "jolly good fellow." Following his divorce, the appellant began to behave oddly, isolating himself from family and friends. On one occasion, approximately one year prior to the shooting, the appellant arrived at Shuler's home at 12:00 a.m. or 1:00 a.m., claiming that he was being pursued by the police. Shuler could find no evidence of any pursuit.

---

[4]The appellant indicated to Dr. Eric Engum, a clinical psychologist who evaluated the appellant following the shooting, that he resumed drinking heavily after his divorce in 1991.

5

Carl McGill, a trusty at the Blount County Jail, testified that, when the appellant was first admitted to the jail, he sat in a corner and ate a pencil. Richard Skidmore and Henry Shuler visited the appellant at the jail following the appellant's arrest. The appellant appeared disoriented and depressed. He whispered throughout their conversation, because he believed that his conversations were being monitored by personnel at the jail. He also stated that his life was in danger at the jail. Finally, he asked his brother and brother-in-law to remove their jackets, because they were the color of the walls at the jail and indicated that Skidmore and Shuler were a part of "the system." While incarcerated in the jail, the appellant attempted suicide.

Dr. Eric Engum, a clinical psychologist, testified on behalf of the appellant. He testified that the appellant had informed him that the appellant's co-workers at the Nippondenso Plant had harassed and intimidated him. Specifically, according to the appellant, the victim, Baskin, drove a cart with which he would frequently attempt to block the appellant's path. His co-workers also signaled to one another for the purpose of harassing the appellant. The appellant believed that, if he did not act, someone would harm him. The appellant particularly felt threatened by the various military jackets worn by the victim. Accordingly, he decided to confront Baskin on the morning of December 17, 1992. Baskin arrived at the Nippondenso plant and parked his truck. At this point, the appellant believed that the victim was reaching for a weapon, and he began firing his rifle at the victim.

Dr. Engum diagnosed the appellant as suffering from alcohol abuse, depression, and a mixed personality disorder. The mixed personality disorder comprised components of three different disorders, including paranoid, antisocial, and narcissistic disorders. Dr. Engum characterized the appellant's mental state as a "siege mentality." He further explained:

> I think it is very evident from all of the facts that in no way could [the appellant] realistically or objectively appraise the nature and aspects of his interactions with Baskin. He was misinterpreting and distorting anything that Baskin did in a very paranoid, suspicious, delusional fashion.

Nevertheless, Dr. Engum concluded that the appellant was mentally competent to stand trial. He also concluded that the appellant was not insane, as the appellant understood the wrongfulness of his conduct and was capable of conforming his conduct to the requirements of the law.

Dr. Ahmed Farooque, a psychiatrist who examined the appellant at the Middle Tennessee Mental Health Institute, testified on behalf of the State. He also diagnosed the appellant as suffering from alcohol dependence, dysthymia, which is "a low-grade, chronic depression," and a non-specific personality disorder, including components of antisocial, narcissistic, histrionic, and borderline personality disorders. He too determined that the appellant was mentally competent to stand trial and that his mental condition could not support a defense of insanity. Dr. Farooque opined that, while the appellant's disorder might significantly impair his ability to function socially or occupationally, the disorder would not necessarily impair his "thinking capacity."[5]

At the conclusion of the trial, the jury found the appellant guilty of attempted first degree murder. On October 5, 1995, the trial court conducted a sentencing hearing. At the hearing, the State relied upon the pre-sentence report and the evidence adduced at trial. The appellant testified on his own behalf. The appellant recounted that, following his resignation from Pathway Bellows and his divorce, he began to believe that he was being followed. At the

---

[5]Dr. Engum's report, which was admitted at trial, indicates that the appellant possesses a Full Scale I.Q. of 108, "which place[s] him in the high average range of intellectual functioning." However, Dr. Engum also stated in his report:

> Though clearly not indicative of underlying organic brain damage, one should be aware that . . . deficits in problem-solving, flexibility, responsivity to feedback and ability to consider multiple aspects of a problem . . . suggest underlying distortions in cognition which may enhance underlying hypersensitivity and feelings of vulnerability.

7

sentencing hearing, he could not recall why he believed he was being followed or by whom, although he did recall believing that the F.B.I. was monitoring his movements. In any case, he began to keep his window blinds closed and his doors locked at all times. He also propped chairs underneath his door handles in order to barricade the doors. At work, he believed that the victim, Baskin, was harassing him, including placing two garottes[6] on the appellant's cart and threatening the appellant. The appellant believed that the colors of Baskin's military jacket signified death. Ultimately, he decided to confront the appellant. The Sunday prior to the shooting, he purchased the .30 caliber rifle. However, the appellant testified that he only shot Baskin on the morning of December 17, 1992, because he believed that the victim was reaching for a weapon. The appellant stated at the sentencing hearing:

> Anyway, I don't know -- I don't know exactly -- that's the straight of it. The man [Baskin] sat here and lied. I know it's a mess. You know, anytime you shed someone's blood, that's wrong. But what happened, to me, was self-defense. You all call it how you see it.

The appellant claimed that he was sorry for what had transpired.

In sentencing the appellant to twenty-three years incarceration in the Tennessee Department of Correction, the trial court found several mitigating factors, including:

> (8) The appellant was suffering from a mental condition that significantly reduced his culpability for the offense;
> (10) The appellant assisted the authorities in locating or recovering any property or person involved in the crime;
> (13) The appellant has no significant criminal record.

Tenn. Code Ann. § 40-35-113 (1990). The court then found the following enhancement factors:

> (6) The personal injuries inflicted upon the victim were particularly great;
> (9) The appellant employed or possessed a firearm during the commission of the offense; and

---

[6]A garotte is an implement or weapon used to strangle a victim. Webster's Ninth New Collegiate Dictionary 506 (1987).

8

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114 (1995 Supp.).

## II.  Analysis

a.  **Proposed Jury Instruction Concerning Attempted Voluntary Manslaughter[7]**

The appellant contends that the trial court erred in refusing to instruct the jury concerning the offense of attempted voluntary manslaughter.  A trial judge must give a correct and complete charge of the law applicable to the facts of the case.  State v. Ruane, 912 S.W.2d 766, 782 (Tenn. Crim. App. 1995); State v. Phipps, 883 S.W.2d 138, 139 (Tenn. Crim. App. 1994).  Accordingly, defendants are entitled to jury instructions on all offenses which are a lesser grade or class of the charged offense, if the evidence would support a conviction for the offense.  State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996); Tenn. Code Ann. § 40-18-110(a) (1990).  Conversely, "the giving of instructions on offenses for which there is no evidence in the record is to be avoided." State v. Davis, 751 S.W.2d 167, 170 (Tenn. Crim. App. 1988).

Attempted voluntary manslaughter is a lesser grade of attempted first degree murder.  See Trusty, 919 S.W.2d at 311.  Voluntary manslaughter "is the

---

[7]We note that, in State v. Kimbrough, 924 S.W.2d 888, 892 (Tenn. 1996), the Supreme Court held that the offense of attempted felony-murder does not exist in Tennessee, as "it is logically and legally impossible to attempt to perpetrate an unintentional killing." The Supreme Court observed that, because the intent required for an attempt is an intent to commit the contemplated crime, attempt to commit murder requires a specific intent to kill. Id. at 891. Thus, the court suggested that the statutory provision on criminal attempt is inapplicable to any crime requiring less than a specific intent.

Voluntary manslaughter requires only knowledge. Tenn. Code Ann. § 39-13-211 (a) (1991). Prior to Kimbrough, this court held that attempted voluntary manslaughter is an offense in Tennessee. State v. Adams, No. 03C01-9403-CR-00123 (Tenn. Crim. App. at Knoxville, January 11, 1995). However, the language in Kimbrough seemingly casts doubt upon our conclusion in Adams. But see State v. Jenkins, No. 01C01-9508-CC-00269 (Tenn. Crim. App. at Nashville, November 15, 1996)(citing Kimbrough, 924 S.W.2d at 890)(one who intends to commit an act that would constitute second degree murder but fails to complete the act commits attempted second degree murder). Of course, if attempted voluntary manslaughter is not a crime in Tennessee, then the trial court committed no error in refusing to instruct the jury on that offense. See, e.g., State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995) (trial court properly denied the appellant's special request for a jury instruction, as the instruction was an incorrect statement of the law).

9

intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1991) (emphasis added). Moreover, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. §39-12-101(a)(3) (emphasis added).[8] Arguably, the evidence adduced at trial does not support a finding that the appellant was in a state of passion at the time of the offense. Clearly, the record does not support a finding of adequate provocation. The appellant disputes the lack of evidence concerning passion, but concedes that any provocation was the product of the appellant's delusional mental state. Nevertheless, he contends that, for the purpose of determining whether there existed provocation adequate to support a conviction for voluntary manslaughter, the applicable standard is a subjective standard, i.e., whether a reasonable person, suffering the appellant's delusions, would have been provoked. The State contends that this standard is "oxymoronic," as a reasonable person would not have suffered the appellant's delusions.

In support of his proposition, the appellant cites Davis v. State, 28 S.W.2d 993 (Tenn. 1930). In Davis, 28 S.W.2d at 993-994, the appellant had been convicted of second degree murder. At the time of the offense, the appellant was "laboring under an insane delusion" that his wife and the victim were conducting an affair. Id. There was no basis whatever for this belief. Id. The appellant encountered the victim at a service station and began to curse the

---

[8]The attempt statute refers to the "circumstances surrounding the conduct as the person believes them to be." Id. However, this reference does not alter our subsequent conclusion that provocation is to be assessed according to an objective standard, in light of the attempt statute's requirement that a person act "with the kind of culpability otherwise required for the offense." Id.

victim "with the utmost violence." Id. Witnesses testified that the victim in no way threatened the appellant, although the appellant claimed that the victim appeared to reach for a weapon. Id. The appellant shot the victim several times, returned to the garage, sat down, and awaited the arrival of the police. Id. The Supreme Court reversed the appellant's conviction for second degree murder. Citing the McNaughten standard, the court specifically rejected the application of the insanity defense. Id. at 995-996. Nevertheless, the court concluded that the appellant's delusions precluded a finding of malice. Id. at 996-997. Moreover, the court observed:

> We are of the opinion that, if, as a matter of fact, the deceased had debauched the wife of the plaintiff in error, and the plaintiff in error had been apprised of that fact and had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition, while under the influence of passion and agitation produced by such information, had killed [the victim], he would only have been guilty of voluntary manslaughter.

> [According to] McNaughten's Case . . . and those following it a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed, would have excused the defendant.

> "Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary . . . "

> Such being the law, it ensues that plaintiff in error would have been guilty of manslaughter only, if, when he was first obsessed by this insane conceit, acting under the passion and agitation thereby produced, he had killed [the victim].

Id. at 996.

In State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992), this court, noting the continuing vitality of Davis, suggested that "the holding in Davis indicated an acceptance of the proposition that an abnormal mental condition short of insanity, as then defined, could be used to negate the state of mind elements, including malice, required for first or second degree murder." The court then noted the change in the insanity standard mandated by Graham v. State, 547 S.W.2d 531, 543 (Tenn. 1977). See also Tenn. Code Ann. § 39-11-

501 (a) (1991) (codifying the criteria of criminal insanity which have been followed in Tennessee since the Graham decision). The court stated:

> Under the Graham test, the cornerstone of a defense to homicide under Davis must be that the defendant's state of mind at the time of the offense had to be the product of a mental disease or defect, not just any mental condition. If the mental disease or defect produced a delusion and the notion embodied in the delusion and believed to be a fact would have excused the defendant's conduct if the notion were indeed a fact, then the conduct committed under such a delusion is, likewise, excusable.

Shelton, 854 S.W.2d at 122.

In Phipps, 883 S.W.2d at 148, this court observed that the "entire line of cases from Davis to Shelton, though frequently not using the term 'diminished capacity,' supports the conclusion that evidence of an accused's state of mind at the time of the offense is admissible in Tennessee to negate the existence of the requisite element of intent." However, the court emphasized that "diminished capacity is not a defense that absolves the accused from culpability; rather, it is a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." Id. at 143 (emphasis added).

In Phipps, 883 S.W.2d at 144, we additionally cited MODEL PENAL CODE § 4.02 Proposed Official Draft 1962), which provides:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is an element of the offense.

The court noted that the legislature, in revising the criminal code in 1989, failed to include a similar provision among the general and affirmative defenses set forth in the statute. Phipps, 883 S.W.2d at 148. However, the court again emphasized that the theory of "diminished capacity" applicable in Tennessee is purely evidentiary and not a means to excuse or justify a criminal offense and

12

observed that "[t]he criminal code does not purport to establish rules of relevance." Id. at 149.

This court specifically distinguished "diminished capacity" from "diminished responsibility," rejecting the latter. Id. at 143-144. Similarly, the drafters of the Model Penal Code, in rejecting diminished responsibility as an alternative ground for reducing murder to manslaughter, explained that cases may arise where evidence of a mental disorder disproves intent to kill, i.e., cases of diminished capacity, but the reduction of murder to manslaughter may be accomplished only through a rule of provocation. The drafters explained the concept of diminished responsibility:

> Unlike provocation, diminished responsibility is entirely subjective in character. It looks into the actors mind to see whether he should be judged by a lesser standard than that applicable to ordinary men. It recognizes the defendant's own mental disorder or emotional instability as a basis for partially excusing his conduct.

Comment, MODEL PENAL CODE § 210.3. The theory of diminished responsibility, unlike the theory of diminished capacity described in Phipps, is a defense. Therefore, we conclude, in contrast to the Phipps case, that the legislature's omission of this defense from the 1989 Criminal Code reflects its rejection of this theory.

Although under the Model Penal Code provocation is not entirely subjective, the Model Penal Code does place far more emphasis than does the common law on the actor's subjective mental state. MODEL PENAL CODE § 210.3(1)(b) (emphasis added) provides:

> Criminal homicide constitutes manslaughter when . . . a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.

13

The drafters noted:

> [T]he Model Code qualifies the rigorous objectivity with which the common law determined adequacy of provocation. . . . The critical element in the Model Code formulation is the clause requiring that reasonableness be assessed "from the viewpoint of a person in the actor's situation." The word "situation" is designedly ambiguous. On the one hand, it is clear that personal handicaps and some external circumstances must be taken into account. . . . On the other hand, it is equally plain that idiosyncratic moral values are not part of an actor's situation. . . . In between these two extremes, . . . abnormally fearful temperament may . . . serve to differentiate an individual actor from the hypothetical reasonable man, yet none of these factors is wholly irrelevant to the ultimate issue of credibility. . . . The Model Code endorses a formulation that affords sufficient flexibility to differentiate in particular cases between those special aspects of the actor's situation that should be deemed material for purpose of grading and those that should be ignored.

Comment, MODEL PENAL CODE § 210.3. Our legislature declined in 1989 to adopt the Model Penal Code's approach to provocation, signaling its intention to adhere to the common law objective standard. Applying an objective standard, the record contains no evidence of provocation, and this issue is without merit.

**b.      Sufficiency of the Evidence**

The appellant next challenges the sufficiency of the evidence supporting his conviction. A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant must establish that the evidence presented at trial was so deficient that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e).

Moreover, an appellate court may neither reweigh nor reevaluate the evidence when determining its sufficiency. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the

weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. Id. See also State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992).

The State may prove a criminal offense by direct evidence, circumstantial evidence, or a combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). See also State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)("the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). See also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). As in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)(citation omitted).

At the time of this offense, the relevant statute defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Again, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . Acts with intent

to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. §39-12-101(a)(3). As to the requisite culpability, a person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1991). Additionally, premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992), and "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-201(b)(2) (1991). Deliberation requires a "cool purpose" and the absence of "passion or provocation." Tenn. Code Ann. § 39-13-201(b)(1) and Sentencing Commission Comments.[9]

Generally, the State has the burden of establishing premeditation and deliberation. Brown, 836 S.W.2d at 543. Again, although the jury may not engage in speculation, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995), the jury may infer premeditation and deliberation from the circumstances surrounding the killing. Gentry, 881 S.W.2d at 3. Our supreme court has delineated several circumstances which may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill the victim, and the making of preparations before the killing for the purpose of concealing the crime. Brown, 836 S.W.2d at 541-542. This court has also recently noted several factors from which the jury may infer the two elements, including planning activity by the defendant before the killing, evidence concerning the defendant's motive, and

_____

[9]However, with respect to deliberation, we note that, in State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993), this court stated, "The [mere] presence of agitation or even anger, in our view, does not necessarily mean that the murder could not have occurred with the requisite degree of deliberation."

the nature of the killing.  Bordis, 905 S.W.2d at 222 (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law § 7.7 (1986)).

We conclude that the evidence is sufficient to support a conviction for attempted first degree murder.  In summary, approximately two weeks prior to the offense, the appellant stated to a co-worker that he was thinking about "killing me a goddam buck."  The State argued at trial that the appellant was referring to the victim, who is African-American.  Moreover, several days prior to the shooting, the appellant stated to a co-worker that he would no longer tolerate harassment by fellow employees.  The afternoon before the shooting, the appellant indicated that he might no longer be working at the plant.  On the morning of the shooting, the appellant arrived at the plant two hours early, at the time Baskin was scheduled to arrive.  He waited in the area of the parking lot where Baskin always parked his truck, armed with a fully loaded .30 caliber rifle, a fully loaded .25 caliber semi-automatic pistol, and a knife.  The appellant shot Baskin, who was unarmed, six times in the chest.  The appellant then sat in his truck and smoked a cigarette.[10]

The appellant's contention that his mental condition precluded premeditation and deliberation was submitted to the jury.  The trial court instructed the jury:

> Evidence has been submitted in this case by the defense and the state concerning the defendant's mental condition.  This evidence should be considered by you, specifically in reference to whether or not the defendant possessed the necessary deliberation or premeditation which are elements of murder in the first degree, or knowledge which is an element of murder in the second degree.
>
> While this evidence may not establish a defense wherein the defendant would be found not guilty of any offense, it may be considered by you in deliberating upon the necessary elements of murder in the first degree or murder in the second degree.  As I

---

[10]"Calmness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder." West, 844 S.W.2d at 148 (citing State v. Browning, 666 S.W.2d 80, 84 (Tenn. Crim. App. 1983), and Sneed v. State, 546 S.W.2d 254, 258 (Tenn. Crim. App. 1976)).

instructed you earlier, should you find that the necessary elements of any of the grades of homicide are not present, the defendant must be acquitted as to that charge. You may consider evidence of the defendant's mental condition along with other relevant evidence in arriving at your verdict.

Again, the evidence adduced at trial indicates that the appellant possesses, at least, average intelligence. Additionally, Dr. Farooque testified that the appellant's personality disorder does not impair his "thinking capacity." Indeed, while incarcerated at the Department of Correction Special Needs Facility, the appellant informed Dr. Farooque that he was not suffering any mood or thought disorder, other than depression as a result of his divorce in 1991. However, he admitted experiencing some difficulty controlling his temper and also conceded that, at times, he overreacted to minor incidents. Dr. Farooque further testified that, while incarcerated at the Blount County Jail, the appellant had been prescribed medication normally prescribed to "a person who is acutely psychotic or has a history of seizures." Dr. Farooque stated that, when he discontinued the appellant's medication, the appellant "did a lot better." Finally, in a staff conference report, Dr. Farooque recorded the following observations:

> At the time of admission . . ., and throughout his stay at this facility, [the appellant again was lucid and coherent and gave no indications of a severe mental illness. He was alert, well oriented and cooperative throughout his stay. His behavior on the residential unit was suggestive of a mild level of depression, however he did not experience difficulties eating or sleeping and he interacted with his peers and the staff.[11] Skidmore's responses to questions were not suggestive of one with a severe thought disorder or an inability to accurately perceive reality. There was no suggestion of him hallucinating, and he did not claim to have been hearing voices or having unusual visual experiences. Skidmore's comments raised the question of paranoid thinking and a general mistrust of others. His vocabulary was representative of someone with a high school education, and his reasoning and judgement did not appear impaired.
>
> . . . [The appellant's] perceptions of the victim are not accurate and may be the product of his alcohol dependence. . . . [The appellant] reports that he shot at [the victim] because he thought Baskin was

[11]In fact, the records of the Special Needs Facility indicate that the appellant did occasionally complain of an inability to sleep. Otherwise, the records indicate that, as stated by Dr. Farooque, the appellant was "quiet and cooperative," interacted well with other patients and staff members, and, generally, exhibited no unusual behavior.

> going for a weapon, and he believed it was appropriate to respond in self-defense.

(Footnote added). Certainly, the record contains sufficient evidence to support a finding by the jury, beyond a reasonable doubt, that the appellant's mental condition did not preclude premeditation and deliberation. With respect to the testimony of the defense expert, Dr. Engum, the evaluation of expert testimony is the province of the jury. State v. Coleman, No. 02C01-9503-CC-00083 (Tenn. Crim. App. at Jackson), perm. to appeal denied, (Tenn. 1996). Accordingly, the jury was free to disregard the testimony of Dr. Engum in light of other evidence adduced at trial.

**c.     Sentencing**

Finally, the appellant contends that his offense does not warrant a sentence of twenty-three years incarceration in the Department of Correction. Review, by this court, of the length of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d) (1990). This presumption only applies, however, if the record demonstrates that the trial court properly considered sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court applies inappropriate factors or otherwise fails to comply with the 1989 Sentencing Act, the presumption of correctness falls. Shelton, 854 S.W.2d at 123. In the instant case, we afford the trial court's determination the presumption of correctness.

In any event, the appellant bears the burden of establishing that the sentence imposed by the trial court is erroneous. State v. Lee, No. 03C01-9308-CR-00275 (Tenn. Crim. App. at Knoxville, April 4, 1995). In determining whether the appellant has met this burden, this court must consider the factors listed in Tenn. Code Ann. § 40-35-210(b)(1995 Supp.) and the sentencing principles

described in Tenn. Code Ann. § 40-35-102 (1995 Supp.) and § 40-35-103 (1990).

Moreover, with respect to the length of a sentence, Tenn. Code Ann. § 40-35-210 (1990) provides that the minimum sentence within the appropriate range is the presumptive sentence. If there are enhancing and mitigating factors, the court must start at the minimum sentence in the range and enhance the sentence as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. Id. If there are no mitigating factors, the court may set the sentence above the minimum in that range, but still within the range. Id. See also State v. Dies, 829 S.W.2d 706, 710 (Tenn. Crim. App. 1991). "[T]here is no particular value assigned by the 1989 Sentencing Act to the various factors and the 'weight afforded mitigating or enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved.'" State v. Marshall, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993)(citation omitted). The weight assigned to any existing factor is generally left to the trial judge's discretion. Id.

Initially, the appellant concedes that the victim's injuries were particularly great. Tenn. Code Ann. § 40-35-114(6). However, he argues that the "real reason" for his sentence of twenty-three years is that "the crime was committed under circumstances under which the potential for bodily injury to a victim was great." Tenn. Code Ann. § 40-35-114(16). He contends that enhancement factor (16) is inapplicable to convictions for attempted first degree murder, as the factor is inherent in the offense. Similarly, he argues that the appellant's use of a firearm during the commission of the offense should be afforded little if any weight in sentencing a defendant for the offense of attempted first degree murder. The appellant asserts that the rationale underlying the application of

20

this factor is the greater danger associated with the use of a firearm. He states in his brief, "There is no way that attempted murder can be anymore dangerous than it already is."

With respect to the application of enhancement factor (9), this court has previously held that a sentencing court may consider the use of a firearm in enhancing a sentence for attempted first degree murder. See, e.g., State v. Gibson, No. 01C01-9503-CC-00099 (Tenn. Crim. App. at Nashville, January 26, 1996)(the defendant shot the victim four times). With respect to the application of enhancement factor (16), the appellant correctly observes that great potential for bodily injury always exists with an attempted first degree murder. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995), perm. to appeal denied, (Tenn. 1996). However, the State correctly notes that this factor may nevertheless enhance a sentence for attempted first degree murder if the proof establishes a potential for bodily injury to persons other than the victim. State v. Parker, No. 03C01-9307-CR-00214 (Tenn. Crim. App. at Knoxville, November 22, 1994), perm. to appeal denied, (Tenn. 1995)(citing State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993)). The record establishes that numerous employees, in addition to the victim, were present in the parking lot of the Nippondenso plant as the appellant fired his rifle at the victim's truck thirteen times.[12] Accordingly, in this case, consideration of factor (16) is appropriate.[13]

With respect to mitigating factors, the appellant argues that, in addition to the three mitigating factors applied by the sentencing court, the record supports

---

[12]We also agree with the State that the substantial risk to the lives of persons other than the victim supports the application of enhancement factor (10). Tenn. Code Ann. § 40-35-114. See, e.g., State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994)(other persons were present when the defendant began to fire his weapon at the intended victim).

[13]It is not entirely clear from the record of the sentencing proceeding that the trial court applied this factor for the reason set forth above. Nevertheless, pursuant to our *de novo* review, we conclude that this factor should enhance the appellant's sentence.

the application of mitigating factor (2), that the appellant acted under strong provocation. Tenn. Code Ann. § 40-35-113. We have already concluded that the record does not support a finding of provocation.

The State contests the application of mitigating factor (10), that the appellant assisted the authorities in locating or recovering any property or person involved in the crime. Tenn. Code Ann. § 40-35-113. Presumably, the trial court was referring to the appellant's voluntary surrender to the police. We will assume, for the purpose of this opinion, that the appellant's voluntary surrender to the police qualifies as assistance to the police within the meaning of mitigating factor (10). See, e.g., State v. Phillips, No. 03C01-9502-CR-00047 (Tenn. Crim. App. at Knoxville, March 25, 1996); State v. Farmer, No. 03C01-9206-CR-00196 (Tenn. Crim. App. at Knoxville, July 8, 1993).

The State also challenges the trial court's consideration of the appellant's lack of a significant criminal history as a mitigating factor. The State cites, in support of its argument, State v. Keel, 882 S.W.2d 410, 422 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994). In Keel, this court refused to consider the appellant's lack of prior felony convictions as a mitigating factor in light of the appellant's extensive history of misdemeanor convictions and criminal behavior.[14] Similarly, the court declined to consider the appellant's stable employment history. The court stated:

> The vast majority of citizens residing in this state do not have a prior felony conviction. If this court permitted an accused's sentence to be mitigated for this reason, it would be inviting the criminal element of our society to engage in criminal conduct punishable as a misdemeanor. . . .
>
> The fact that the appellant had a 'fairly stable employment history'. . . does not entitle him to a reduction in his sentence. . . . Every citizen in this state is expected to have a stable work history if the

---

[14]In the instant case, the pre-sentence report reflects that the appellant's criminal history consists of two prior misdemeanor convictions for public intoxication.

22

economy permits the citizen to work, the citizen is not disabled, or the citizen is not independently wealthy.

See also State v. Yankee, No. 03C01-9507-CC-00200 (Tenn. Crim. App. at Knoxville, August 6, 1996), perm. to appeal denied, (Tenn. 1997) ("the lack of a felony conviction and a stable work history do not entitle an accused to a reduction in the sentence imposed by the trial court"). Moreover, this court has stated more broadly that the lack of any criminal record will not mitigate a sentence. See State v. Garrison, No. 01C01-9407-CC-00236 (Tenn. Crim. App. at Nashville, September 20, 1995), perm. to appeal denied, (Tenn. 1996)("the legislature did not intend the absence of a prior criminal record to be a mitigating factor because citizens are not expected to have a criminal record"); State v. Derrick, No. 181 (Tenn. Crim. App. at Knoxville, December 6, 1990)("[o]bviously the legislature chose not to include [the absence of a criminal record] as a [mitigating] factor because citizens are not expected to have criminal records"). Yet, this court has also observed that, while a court is not required to do so, Tenn. Code Ann. § 40-35-113 (13) allows a court to consider the absence of a criminal record as a mitigating factor. State v. Williams, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995), perm. to appeal denied, (Tenn. 1996). Similarly, this court has observed that consideration of the absence of a criminal history is consistent with the purposes and principles of the sentencing act. State v. Bingham, 910 S.W.2d 448, 457 n.2 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995).

In any event, while we agree with the trial court that the appellant is not "the worst possible person under our law that could commit this offense," the applicable enhancement factors amply justify a sentence of twenty-three years. We reach this conclusion even in light of the trial court's further determination

23

that the appellant was suffering from a mental condition that significantly reduced his culpability for the offense.[15]

For the foregoing reasons, we affirm the judgment of the trial court.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JOSEPH B. JONES, Presiding Judge

_____
PAUL G. SUMMERS, Judge

---

[15]Parenthetically, we reject the State's contention that the jury's verdict, finding the appellant guilty of attempted first degree murder, precluded the application of this mitigating factor. Based upon the record, the trial court was certainly capable of concluding that, while the appellant's mental condition did not prevent him from forming the requisite mental state of premeditation and deliberation, it nevertheless reduced his culpability for the purpose of sentencing. Nor do we agree with the State that "to find this factor applicable but to refuse to charge voluntary manslaughter as a lesser-included offense is logically inconsistent." As we noted earlier, the provocation necessary to establish voluntary manslaughter is determined solely by an objective "reasonable person" standard and is not related to the mental condition of a particular defendant.